Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| V.C., and L.C.,<br><br>         Plaintiffs,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY, and the EMERGENT BIOSOLUTIONS INC. BENEFIT PLAN.<br><br>         Defendants. | COMPLAINT<br><br><br><br>Case No. 4:22-cv-00042 – PK<br><br>Magistrate Judge Paul Kohler |

Plaintiffs V.C. and L.C., through their undersigned counsel, complain and allege against Defendants Aetna Life Insurance Company ("Aetna") and the Emergent Biosolutions Inc. Benefit Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. V.C. and L.C. are natural persons residing in Montgomery County, Maryland. V.C. is L.C.'s father.

1

2. Aetna is an insurance company headquartered in Hartford, Connecticut and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). V.C. was a participant in the Plan and L.C. was a beneficiary of the Plan at all relevant times. V.C. and L.C. continue to be participants and beneficiaries of the Plan.

4. L.C. received medical care and treatment at Evoke at Entrada ("Evoke") from January 31, 2020, to March 31, 2020, and Solacium Sunrise ("Sunrise") from April 24, 2020, to November 2, 2020. During the treatment at issue these were licensed treatment facilities located in Washington County Utah, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Aetna denied claims for payment of L.C.'s medical expenses at Evoke and Sunrise.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Aetna has business offices and a significant presence in the state, and the treatment at issue took place in Utah.

8. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the

Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Evoke

10. L.C. was admitted to Evoke on January 31, 2020, due to issues which included anxiety, depression, substance use, self-isolation, poor school performance, unpredictable violent and destructive behaviors, and trauma from a sexual assault. Aetna denied payment for this treatment.

11. On December 8, 2020, V.C. submitted an appeal of the denial of payment of L.C.'s treatment at Evoke, as well as her crisis transportation there. V.C. stated that he had received a variety of Explanation of Benefits ("EOB") statements denying payment for numerous reasons. He summarized the denials as follows:

| Dates of Service | Denial Reason |
|---|---|
| 01/31/2020 | R03 – This service is denied because it is inappropriately coded based on standard coding guidelines. The payment for the procedure was included in the hospital payment. |
| 02/01/2020-02/15/2020 | W91 – The service is not covered as the |
| 02/16/2020-02/29/2020 | proper certification was not obtained. |
| 03/01/2020-03/15/2020 | O60 – We have reviewed the information |

| | |
|---|---|
| 03/16/2020-03/31/2020 | received about the member's condition. Based on the information received, it does not support an acute inpatient stay. |

12. V.C. disputed Aetna's justifications for denying payment in its EOB's. He stated that the claims had not been coded improperly as the January 2020 EOB had asserted, and in fact he wrote that he had submitted all the claims in the same fashion using the appropriate "1006" revenue code for outdoor behavioral health services. He questioned how this would result in only one EOB referencing a coding error.

13. He wrote that his insurance policy did not contain any precertification requirements for outdoor behavioral healthcare so the denials for improper certification in the February EOB's also appeared to have been made in error.

14. He stated that the EOB's for March also denied payment in error as they referenced an "acute inpatient stay" and L.C. did not receive acute inpatient care at Evoke.

15. He stated that he was entitled to certain protections under ERISA during the review process, including a full, fair, and thorough review of the denial conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the documentation he provided, which gave a meaningful response to all of his arguments, and which gave him the specific reasoning for the determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

16. He asked that the reviewers be trained in the details of MHPAEA and asked that they reach out to Dr. Michael Gass from the University of New Hampshire – an expert in the field of outdoor behavioral healthcare – if they did not have experience with outdoor

behavioral health treatment. He also asked to be provided with any documentation related to the decision to deny payment including the reviewers' case notes and reports.

17. He wrote that in addition to the EOB's for residential treatment, he had received an EOB dated August 25, 2020, which denied payment for L.C.'s transportation to Evoke under code U36, "Charges for non-emergency transport are excluded from coverage under the member's benefit plan."

18. He stated that he was unable to find any exclusion for non-emergency transportation services, however he was able to find an exclusion for "transportation" in the behavioral health section of the insurance policy. He argued that an exclusion could not be applied solely to behavioral health transportation without violating MHPAEA.

19. He wrote that under MHPAEA insurers were required to ensure that benefits for behavioral health services were offered at parity and were no more restrictive than benefits for analogous medical or surgical services.

20. He stated that he had shown he was entitled to relief under MHPAEA as the Plan was subject to the statute, the Plan offered benefits for mental health/substance use and medical/surgical care, the mental health transportation L.C. received was analogous to the medical/surgical transportation covered by the Plan, and Aetna was applying an exclusion to mental healthcare that it did not equally apply to analogous medical/surgical services.

21. He asked Aetna to perform a MHPAEA compliance analysis for the treatment at Evoke and L.C.'s transportation there and requested that it provide him with physical copies of the results of this analysis.

22. In the event the denial was maintained, V.C. asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents,

the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or criteria utilized in the determination as well as their medical or surgical equivalents (whether or not these were used, so that he could evaluate the Plan's compliance with MHPAEA), as well as any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates. (collectively the "Plan Documents")

23. In a letter dated January 13, 2021, Aetna again denied payment for L.C.'s treatment at Evoke. The letter gave the following justification for the denial:

> We reviewed information received about the member's condition and circumstances and the member's benefit plan. We are denying coverage for Mental Health Residential treatment. Mental Health Residential treatment programs cannot be a Wilderness Treatment Program (whether or not the program is part of a licensed residential treatment facility or otherwise licensed institution). Therefore, Mental Health Residential treatment is not covered under the terms of the plan.

24. Aetna sent a second denial letter which was also dated January 13, 2021. The letter stated that L.C.'s residential treatment at Evoke and her transportation there had been denied. The letter cited to language from the exclusions section of the summary plan description which listed "Wilderness treatment programs (whether or not the program is part of a **residential treatment facility** or otherwise licensed institution)" as some of the services excluded by the policy language (emphasis in original).

25. On March 8, 2021, V.C. submitted a second appeal for L.C.'s transportation to Evoke and her treatment there. He wrote that Evoke was a licensed and accredited facility and that it met the definition of a provider in his insurance policy.

26. He stated that there was an exclusion in the insurance policy for "Wilderness treatment programs" but he contended that this provision violated MHPAEA and was unenforceable as it imposed a restriction on mental health services which was not equally applied to analogous medical or surgical services.

27. He stated that the proper medical and surgical analogues to outdoor behavioral health programs included skilled nursing, subacute rehabilitation, and inpatient hospice care.

28. He contended that Aetna's wilderness exclusion was a non-quantitative treatment limitation in violation of MHPAEA as the exclusion specifically applied only to mental health treatment and not analogous medical or surgical services. He stated that this was particularly troubling as the wilderness exclusion was the only justification given for the denial of payment.

29. He again argued that Aetna also violated MHPAEA by allowing "Non-Emergency Use of Ambulance" for medical services but not for mental health services. He again asked for a parity compliance analysis to be performed and to be provided with physical copies of the results of this analysis. He also repeated his request for the Plan Documents.

30. In a letter dated April 8, 2021, Aetna again denied payment for L.C.'s treatment at Evoke and her crisis transportation there. The letter quoted excerpts from the exclusions section of the summary plan description and stated that wilderness care and educational services were not covered.

31. It also noted that Aetna required residential treatment centers to be licensed, credentialed by Aetna, or accredited by The Joint Commission, the Committee on Accreditation of Rehabilitation Facilities, the American Osteopathic Association's Healthcare Facilities Accreditation Program, or the Council on Accreditation. In addition, Aetna required

7

residential treatment facilities to have a behavioral health provider actively on duty 24 hours a day, as well as weekly treatment by a psychiatrist, and that the medical director needed to be a psychiatrist.

32. The letter then quoted the provision for Ambulance services, which stated:

> **Eligible health services** include transport by professional ground **ambulance** services:
> - To the first **hospital** to provide **emergency services.**
> - From one **hospital** to another **hospital** if the first **hospital** cannot provide the **emergency services** you need.
> - From a **hospital** to your home or to another facility if an **ambulance** is the only safe way to transport you.
> - From your home to a **hospital** if an **ambulance** is the only safe way to transport you. Transport is limited to 100 miles.
>
> Your plan also covers transportation to a **hospital** by professional air or water **ambulance** when:
> - Professional ground **ambulance** transportation is not available.
> - Your condition is unstable, and requires medical supervision and rapid transport.
> - You are travelling from one **hospital** to another and
>   - The first **hospital** cannot provide the **emergency services** you need, and
>   - The two conditions above are met. (emphasis in original)

### Sunrise

33. L.C. was admitted to Sunrise on April 24, 2020.

34. In a letter dated April 24, 2020, Aetna stated that it required additional information concerning L.C.'s treatment to make a coverage determination. In particular, the letter requested the following information:

> Clinical information is needed in order for a determination to be made regarding a request we received. Please forward information that includes the member's presenting problem and symptoms, psychiatric history and treatment, substance abuse history and treatment, medical problems and medications, risk factors including suicidal and homicidal ideation, self-injurious behaviors, support system, and collaboration with other providers in regard to the member's care.

35. On September 30, 2020, V.C. submitted a copy of L.C.'s medical records and asked for the full, fair, and thorough review to which he was entitled under ERISA.

36. In a letter dated October 19, 2020, Aetna denied payment for L.C.'s treatment at Sunrise. The letter stated in pertinent part:

    > Please refer to your SPD and the section titled **"HMO Provider Networks"**
    >
    > HMOs have contracts with certain physicians and licensed medical professionals. HMOs also have contracts with certain hospitals and medical facilities. These groups form HMO networks from which you receive medical services. Each HMO has its own network of doctors and hospitals.
    >
    > An HMO pays for services only if the services are rendered by a Provider or facility which is in that HMO's network. There is no payment for services received outside of the network. …
    >
    > Failure to receive authorization for services from the HMO and/or your PCP will result in nonpayment of those services.

37. On March 8, 2021, V.C. appealed the denial of payment for L.C.'s treatment at Sunrise. V.C. stated that Aetna was incorrect and the Plan did include coverage for out-of-network care. Furthermore, he stated that the Plan was not an HMO plan. He argued that Aetna's decision to deny payment based on factors which did not apply was "absolutely unacceptable and without merit."

38. He attached an updated copy of L.C.'s medical records with the appeal and asked for a review to be performed in accordance with his rights under ERISA. He wrote that it was obvious Aetna had not conducted an appropriately thorough review as it had not rendered a decision in accordance with "the terms and conditions of my policy." He accused Aetna of neglecting its fiduciary duty and failing to act in his best interest.

39. He asked that in the event the denial was maintained that Aetna specifically identify why the terms and conditions of the Plan appeared not to apply. He again requested to be provided with a copy of the Plan Documents.

40. Aetna did not respond to V.C.'s March 8, 2021, appeal.

41. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA to the degree possible given Aetna's failure to comply with ERISA's claims procedure regulations.

42. The denial of benefits for L.C.'s treatment was a breach of contract and caused V.C. to incur medical expenses that should have been paid by the Plan in an amount totaling over $330,000.

43. Aetna failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of V.C.'s requests.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

44. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Aetna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

45. Aetna and the Plan failed to provide coverage for L.C.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

46. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

    //

47. The denial letters produced by Aetna do little to elucidate whether Aetna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Aetna failed to substantively respond to the issues presented in V.C.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

48. In fact, Aetna failed to respond to respond to the March 8, 2021, appeal entirely and denied payment for Sunrise based on provisions from an HMO plan which did not apply.

49. Aetna and the agents of the Plan breached their fiduciary duties to L.C. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in L.C.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of L.C.'s claims.

50. The actions of Aetna and the Plan in failing to provide coverage for L.C.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

51. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under both causes of action.

//
//
//
//

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

52. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Aetna's fiduciary duties.

53. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

54. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

55. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

56. The medical necessity criteria used by Aetna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

57. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for L.C.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

58. When Aetna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

59. Aetna and the Plan evaluated L.C.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

60. As an example of a violation of MHPAEA, Plaintiffs alleged that Aetna allowed non-emergency medical or surgical transportation but specifically precluded this treatment for mental healthcare.

61. V.C. also stated that the Plan's exclusion for wilderness care was a limitation only applied to mental health services and did not apply to medical or surgical care.

62. Aetna excludes outdoor behavioral health treatment in large part on the basis that Aetna considers these services to be experimental or investigational. But the National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

63. Plaintiffs are aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by Aetna on the basis that they are experimental or investigational.

64. In the last denial letter for Evoke, Aetna also listed factors such as having a behavioral health provider actively on duty 24 hours a day, as well as weekly treatment by a psychiatrist as preconditions for the treatment at Evoke to be approved. Aetna did not raise this argument for the treatment at Sunrise.

65. The Plan purports to rely on generally accepted standards of medical practice when it evaluates the medical necessity of covered benefits. Generally accepted standards of medical practice for residential treatment centers and outdoor behavioral health services include policies such as regular meetings with a mental health professional and evidence-based treatment interventions.

66. Evoke and Sunrise are licensed treatment facilities and provide treatment in a manner that complies with generally accepted standards of medical practice.

67. Generally accepted standards of medical practice are largely codified and enforced by the appropriate licensing, regulatory, and accreditation entities.

68. In the case of residential treatment for mental health and substance use disorders, no licensing, regulatory, or accreditation entities require factors such as 24-hour "behavioral health provider" onsite presence as part of generally accepted standards of care.

69. Aetna also requested medical records documenting "suicidal and homicidal ideation" and "self-injurious behaviors"

70. No licensing, regulatory, or accreditation entities require residential treatment facilities be qualified to treat an individual who is an imminent risk of harm to self or others or suffering from other acute level conditions such as active psychosis.

71. Through its imposition of requirements which are stricter than those dictated by generally accepted standards of care as reflected in the licensing, regulatory, and accreditation entity requirements, Aetna violates MHPAEA.

72. Aetna violates MHPAEA because it relies on generally accepted standards of care and the standards of licensing, regulatory, and accreditation entities to develop its medical necessity guidelines for intermediate level medical or surgical facilities but holds residential treatment to a stricter standard beyond what is advised and considered appropriate by the relevant licensing, regulatory, and accreditation entities.

73. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Aetna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

74. Aetna and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Aetna and the Plan were not in compliance with MHPAEA.

75. In fact, despite V.C.'s requests that Aetna and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and

claim administrators perform parity compliance analyses, Aetna and the Plan have not provided V.C. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Aetna and the Plan have not provided V.C. with any information about the results of this analysis.

76. The violations of MHPAEA by Aetna and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendants violate MHPAEA;

   (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

   (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

   (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

   (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

   (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

   (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

77. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for L.C.'s medically necessary treatment at Evoke and Sunrise under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 24th day of June, 2022.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs

County of Plaintiffs' Residence:
Montgomery County, Maryland.